UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04 - 12632 REK

WARREN PEPICELLI, as he is TRUSTEE of the
UNITE NATIONAL HEALTH FUND; and as
he is TRUSTEE of the UNITE NATIONAL
RETIREMENT FUND,
               Plaintiffs

MAGISTRATE JUDGE _____
C.A. No.

vs.

A.T. SPORTSWEAR, INC.,
               Defendant

RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK _____
DATE _____

## COMPLAINT

### NATURE OF ACTION

1.     This is an action brought pursuant to §§502 and 515 of the Employee Retirement

Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§1132 (a) (3) and (d) (1) and

1145, by employee benefit plans to enforce the obligations to make contributions to such plans

due under the terms of collective bargaining agreements and the plans.

### JURISDICTION

2.     The Court has exclusive jurisdiction of this action pursuant to §502 (a), (e) and (f)

of ERISA, 29 U.S.C. §1132 (a), (e) and (f), without respect to the amount in controversy or the

citizenship of the parties, as well as pendent jurisdiction.

### PARTIES

3.     Plaintiff Warren Pepicelli is a Trustee of the Union of Needletrades, Industrial and

Textile Employees ("UNITE") National Health Fund. The UNITE National Health Fund is an

"employee welfare benefit plan" within the meaning of §3 (3) of ERISA, 29 U.S.C. §1002 (3).

The UNITE National Health Fund maintains its principal place of business at 275 Seventh Avenue, New York, New York.

4.      Plaintiff Ronald Alman is a Trustee of the UNITE National Retirement Fund. The UNITE National Retirement Fund is an "employee benefit plan" within the meaning of §3 (2) of ERISA, 29 U.S.C. §1002 (2) (A). The Retirement Fund maintains its principal place of business at 218 West 40th Street, New York, New York.

5.      The Health and Retirement Funds are multi-employer plans within the meaning of §3 (37) of ERISA, 29 U.S.C. §1002 (2)(A). They are hereinafter collectively referred to as "the Funds."

6.      Plaintiff Trustee ("the Trustee" or "Plaintiff") is a fiduciary within the meaning of §3 (21) of ERISA.

7.      Defendant A.T. Sportswear, Inc. was a Massachusetts corporation with a principal place of business at 366 Eastern Avenue, Malden, Massachusetts. A.T. Sportswear was an employer engaged in commerce within the meaning of §3 (5) and (12) of ERISA, 29 U.S.C. §1002 (5) and (12).

## GENERAL ALLEGATIONS OF FACT

8.      A.T. Sportswear was signatory to a series of successive collective bargaining agreement with the New England Joint Board, Union of Needletrades, Industrial and Textile Union ("UNITE'), requiring contributions to the Funds, including the collective bargaining agreement which was effective from June 15, 2000 through June 15, 2003. A copy of the relevant pages of that agreement is attached hereto as Exhibit A.

9.      The agreement required A.T. Sportswear to make monthly payments to the Funds, equivalent to a negotiated percentage of its total gross weekly factory payroll.

## COUNT I - VIOLATION OF ERISA - DELINQUENT CONTRIBUTIONS

10.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 9.

11.    The Funds determined through payroll records that A.T. Sportswear owes $262,326.02 in unpaid fringe benefit contributions for the period January, 1998 through December, 2002.

12.    On July 24, 2002, the Funds' counsel sent A.T. Sportswear a demand for payment of the $236,802.00 in contributions that it owed for the period March, 1997 through October, 2001, plus the estimated amount of $28,000.00 it owed for the period November, 2001 through June, 2002.

13.    A copy of the bill for the $236,802.00 in contributions owed as of July, 2002 had been previously sent to A.T. Sportswear, but remained unpaid.

14.    To date, A.T. Sportswear has failed and refused to pay the $262,326.02 that it currently owes the Funds in unpaid contributions for the period January, 1998 through December, 2002. In fact, A.T. Sportswear has not made a payment to the Funds since an April/June, 1997 payment of $1,000.00.

15.    The failure of A.T. Sportswear to make contributions on behalf of all covered employees as required by the terms of the Funds and the collective bargaining agreement violates §515 of ERISA, 29 U.S.C. §1145.

16.    Absent an order from the Court, the defendant will continue to refuse to pay the contributions it owes to the Funds, and the Funds and their participants will be irreparably damaged.

3

17.    A copy of this Complaint is being served upon the Attorney General, the Secretary of Labor and the Secretary of the Treasury by certified mail as required by §502 (h) of ERISA, 29 U.S.C. §1132 (h).

## RELIEF REQUESTED

WHEREFORE, plaintiff Funds requests this Court to grant the following relief:

a.    Order the attachment of the machinery, inventory and accounts receivable of defendant A.T. Sportswear, Inc.;

b.    Enter a preliminary and permanent injunction enjoining A.T. Sportswear, Inc. from refusing or failing to make contributions to Plaintiff Funds;

c.    Enter judgment in favor of Plaintiff Funds and against A.T. Sportswear, Inc. under Count I in the amount of $262,326.02, representing the unpaid contributions due through December, 2002, plus any additional amounts determined by the Court to be owed by the defendant or which may become due during the pendency of this action, together with interest on the unpaid contributions at the rate prescribed under §6621 of the Internal Revenue Code, liquidated damages, reasonable attorney's fees and costs, all pursuant to 29 U.S.C. §1132 (g) (2); and

d.    Such further relief as this Court deems appropriate.

Respectfully submitted,

WARREN PEPICELLI, as he is TRUSTEE
of the UNITE NATIONAL HEALTH
FUND, et al,

By their attorneys,

Anne R. Sills, Esquire
BBO #546576

4

Gregory A. Geiman, Esquire
BBO #655207
Segal, Roitman & Coleman
11 Beacon Street
Suite #500
Boston, MA  02108
(617) 742-0208

Dated:  December 15, 2004

Gregory A. Geiman, Esquire
BBO #655207
Segal, Roitman & Coleman
11 Beacon Street
Suite #500
Boston, MA  02108
(617) 742-0208

Dated:  December 15, 2004

JUNE 15, 2000 - JUNE 15, 2003 CONTRACT

BY AND BETWEEN

LOCALS 12, 33, 46, 73, 80, 229, 242, 281, 291, 397, 524, and 554

OF THE

NEW ENGLAND JOINT BOARD,

UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE

EMPLOYEES, AFL-CIO, CLC

AND

A.T. SPORTSWEAR INC.

# TABLE OF CONTENTS

ARTICLE 1: MUTUAL OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE 2: UNION RECOGNITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE 3: UNION MEMBERSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE 4: TRIAL PERIOD - NOTIFICATION . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE 5: CHECK OFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 6: HOURS-OVERTIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 7: MINIMUM WAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE 8: WAGE INCREASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE 9: STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE 10: DISCHARGE AND DISCIPLINE . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE 11: DISTRIBUTION OF WORK . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE 12: CHAIRMAN-PRICE COMMITTEE . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE 13: FAIR EMPLOYMENT PRACTICES . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE 14: ASSIGNMENT TO OTHER WORK . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE 15: HOLIDAYS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE 16: RIGHT TO LEAVE SHOP - CALL-IN PAY . . . . . . . . . . . . . . . . 9

ARTICLE 17: MILITARY SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 18: BENEFIT FUNDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 19: INDIVIDUAL CONTRACTS - SUB-CONTRACTING . . . . . . . . . 14

ARTICLE 20: GARMENT ACCESSORIES . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE 21: JOB RIGHTS - ILLNESS - LEAVE OF ABSENCE . . . . . . . . . . . 15

ARTICLE 22: CONTRACTORS - ADDITIONAL SHOPS
MOVING - INTEGRATED PRODUCTION . . . . . . . . . . . . . . . . . . . 17

ARTICLE 23: CROSSING PICKET LINE . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 24: LABOR DISPUTE-STRUCK WORK . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 25: RECALL AFTER LAYOFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE    26:    ACCESS TO SHOP - EXAMINATION
OF BOOKS, PAYROLL RECORDS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

ARTICLE    27:    AGENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

ARTICLE    28:    NON-PAYMENTS - RESPONSIBILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

ARTICLE    29:    CHANGE AND COST OF LIVING . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

ARTICLE    30:    CHANGE IN LEGAL MINIMUMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

ARTICLE    31:    LIMITATION ON VACATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

ARTICLE    32:    NO-STRIKE, NO-LOCKOUT PLEDGES  . . . . . . . . . . . . . . . . . . . . . . . . . .  23

ARTICLE    33:    ADJUSTMENT MACHINERY COURT ACTIONS BARRED . . . . . . . . . . . . .  24

ARTICLE    34:    NEW PRODUCTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

ARTICLE    35:    SUBSIDIARY, AUXILIARY OR AFFILIATED FIRMS  . . . . . . . . . . . . . . . .  26

ARTICLE    36:    UNION LABEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

ARTICLE    37:    LIQUIDATED DAMAGES FOR VIOLATIONS  . . . . . . . . . . . . . . . . . . . . . .  27

ARTICLE    38:    EMPLOYER LIABILITY AND RESPONSIBILITY  . . . . . . . . . . . . . . . . . . .  27

ARTICLE    39:    ADDITIONAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

ARTICLE    40:    BEREAVEMENT PAY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

ARTICLE    41:    CONFORMITY TO LAW - SAVINGS CLAUSE . . . . . . . . . . . . . . . . . . . . . .  28

ARTICLE    42:    HOLIDAY TRUST FUND CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

ARTICLE    43:    COOPERATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

ARTICLE    44:    PIECE RATE REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

ARTICLE    45:    IMPORTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

ARTICLE    46:    HEALTH, SAFETY AND SANITATION  . . . . . . . . . . . . . . . . . . . . . . . . . .  31

ARTICLE    47:    MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

ARTICLE    48:    TERM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

SCHEDULE "A" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

SCHEDULE "B" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

LETTER OF UNDERSTANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

**THIS AGREEMENT,** made and entered into as of the 1st day of January, 2000 by and between **A.T. SPORTSWEAR INC.,** hereinafter designated as the **"EMPLOYER",** contracting for itself, its successors and assigns and LOCALS 12, 33, 46, 73, 80, 229, 242, 281, 291, 397, 524 and 554 of the **NEW ENGLAND JOINT BOARD, UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES, AFL-CIO, CLC, (UNITE)** contracting for themselves and for the employees now or hereafter employed in the Employer's shops located within the jurisdiction of said locals, all the foregoing union affiliates being hereinafter collectively designated as the **"UNION".**

## WITNESSETH

**WHEREAS,** the Employer, **A.T. SPORTSWEAR INC.,** is engaged in the apparel and clothing industry as a contractor for jobbers or manufacturers in the production of skirt sets, skirts, blouses, slacks, general sportswear and/or of coats and suits, dresses and other apparel, and

**WHEREAS,** the workers employed by the Employer have duly designated the Union as their exclusive bargaining representative for the purpose of collective bargaining with respect to rates of pay, wages, hours and other conditions of employment; and

**WHEREAS,** the parties desire to cooperate in establishing conditions which will tend to secure a living wage and improved working conditions, and to provide methods for a fair and peaceful adjustment of all disputes that may arise between the parties;

**NOW, THEREFORE,** in consideration of the mutual promises and obligations herein assumed and contained and other good and valuable considerations, the parties agree as follows:

## ARTICLE 1: MUTUAL OBLIGATIONS

The Employer and the Union agree that this Agreement shall be binding upon them and their respective transferees, successors and assigns, and that they will faithfully comply with its provisions. In the event the Employer sells or transfers the business or the shop, the Employer shall nevertheless continue to be liable for the complete performance of this Agreement until and unless the purchaser or transferee expressly acknowledges in writing that it is fully bound by the terms of this Agreement.

## ARTICLE 2: UNION RECOGNITION

The bargaining unit covered by this Agreement consists of all non-supervisory production, maintenance, packing and shipping workers employed by the Employer. The term "workers" or "employees", as used throughout this Agreement, refers only to workers included in the bargaining unit. It is agreed that the Union represents a majority of such workers and that it shall be the sole and exclusive bargaining representative for all workers in the bargaining unit during the entire period of this Agreement. The Employer shall not directly or indirectly discourage membership in the Union.

## ARTICLE 3: UNION MEMBERSHIP

Good standing membership in the Union shall be a condition of employment for all employees on and after the thirtieth day following the beginning of such employment or the execution or effective date of this provision, whichever is the later, but not before completion of the worker's trial period.

## ARTICLE 4: TRIAL PERIOD — NOTIFICATION

1. Newly hired experienced workers shall be deemed during their first two (2) weeks of employment and newly hired inexperienced workers shall be deemed during their first

four (4) weeks of employment to be engaged for a trial period, during which they may be discharged without regard to cause.

2. The Employer shall notify the Union monthly in writing of all new employees hired and of all employees terminated.

## ARTICLE 5: CHECK OFF

The Employer agrees to deduct membership dues (which shall be deemed to include periodic fixed dues, initiation fees and assessments) from the earnings of its employees monthly and transmit the same to the Union or its designee within forty-eight (48) hours thereafter, subject to the requirements of law concerning authorization and assignment by the workers individually. Sums so deducted by the Employer shall be kept separate and apart from the general funds of the Employer and shall be held in trust by the Employer for the benefit of the Union.

The Employer shall also honor checkoff authorizations from workers who are members of the Union for political contributions to the UNITE Campaign Committee and AFL-CIO COPE insofar as same are permitted by law.

## ARTICLE 6: HOURS-OVERTIME

The regular work week shall be thirty-five (35) hours divided equally among the five (5) days, Monday through Friday. All work performed after forty (40) hours shall be overtime work and paid for at the rate of time and one-half. Overtime work may be performed only upon Union approval, which the Union agrees not to unreasonably withhold. The Employer agrees to the extent possible to give employees reasonable advance notice of overtime work.

## ARTICLE 7:  MINIMUM WAGES

1. All employees who are employed for one month or more shall receive a craft minimum wage of no less than the following rates computed on a daily basis:

|  | Effective 6-15-00 | Effective 6-15-01 | Effective 6-15-02 |
|---|---|---|---|
| Cutters | 11.75 | 11.90 | 12. 05 |
| Sample Makers | 8.95 | 9.10 | 9.25 |
| Operators | 6.70 | 7.05 | 7.20 |
| Top Pressers | 9.40 | 9.55 | 9.70 |
| Under Pressers | 7.85 | 8.00 | 8.15 |
| Floor Help | 6.55 | 6.90 | 7.05 |
| Pleaters | 8.65 | 8.80 | 8.95 |

Where the Employer employs only time workers as operators or pressers, then the minimum hourly rate for such time workers shall be ten (10%) percent above the craft minimum.

2. With respect to operators and all other piece workers, the piece rates for each separate operation or section shall be set so that the actual average straight time earnings of the workers on that operation or section are no less than 30% above the foregoing applicable craft minimum.  In computing said average, workers with less than six (6) months' experience in the industry may be excluded.  Where workers have demonstrated their ability to earn more than this, piece rates on new work shall be set to yield no less than their previously demonstrated straight time hourly earnings during a representative period.

## ARTICLE 8: WAGE INCREASES

See Schedule "A" or "B".

## ARTICLE 9: STANDARDS

1.  Wages shall be paid in cash weekly on a fixed day.

2.  No homework shall be permitted.

3.  The Employer shall comply with all the standards of sanitation and safety required by law.

4.  The Employer shall not charge workers for damage to material unless caused willfully.

5.  Unless otherwise directed by the Union, workers shall not be required to work on garments for which the piece rates have not been set or finally settled because of delay by the Employer. Any adjustments in piece rates shall be retroactive to the inception of the work.

6.  The Employer shall have a time clock in the shop. Each employee shall punch the clock immediately before and after work.

7.  A worker shall be compensated for time lost through excessive machine breakdown, and shall also be compensated for excessive waiting time from other causes for which such worker is not responsible.

8.  Wages, prices, standards and other working conditions now existing or hereafter established in the Employer's shop shall not be lowered.

9.  The parties to this Agreement recognize the necessity of a cooperative effort and to obtain maximum production and efficiency. To that end, it is agreed that the Employer may adopt, with the consent of the Union, any system of work in its plant and may change systems of work, provided, however, that such changes or adoptions of new or different systems shall not occasion any reductions in the earnings of their employees.

10. If provision is made in this Agreement for the payment of vacation pay by the Employer

to the workers, any worker who leaves his/her employ for good reason or whose employment is terminated involuntarily prior to the distribution of such payment shall then be entitled to receive his/her pro rata vacation pay from the Employer corresponding to the fractional portion of the twelve (12) month period preceding such distribution in which he/she worked for the Employer.

11. The Employer may grant merit, length-of-service, or other individual increases or adjustments only upon approval by the Union.

12. Photo-marking machines shall be used only on the Employer's premises and must be operated by an employee covered by this Agreement.

### ARTICLE 10: DISCHARGE AND DISCIPLINE

No worker shall be discharged or otherwise disciplined without good and sufficient cause, except during his/her trial period. If the discharge or disciplinary act is found to be unjustified, the worker shall be reinstated and may be compensated for his/her loss of earnings during the period of such discharge or disciplinary act.

### ARTICLE 11: DISTRIBUTION OF WORK

1. At all times work shall be distributed among the workers on an equal and equitable basis.

2. No member of the Employer or supervisory employee or designer or any other person outside the bargaining unit shall perform any work in any job covered by this Agreement, unless an emergency exists in the shop.

3. If a worker has been laid off and any member of the Employer or supervisory employee or designer or any person outside the bargaining unit does his/her work, the Employer shall reimburse the worker so laid off for his/her loss of earnings and shall immediately re-employ him/her. However, this shall not prohibit anyone from

6

instructing a worker, or testing a machine.

4. In the event of a permanent reduction in personnel, then the Seniority principle shall prevail, and the employee with the least length of service shall be laid off. This shall be done, after discussions with the Union. Any grievance under this section is subject to the arbitration provisions of this Agreement. In the event of recall, the last employees laid off shall be the first to return.

## ARTICLE 12: CHAIRMAN-PRICE COMMITTEE

There shall be a Shop Chairman and Price Committee selected by or under the auspices of the Union.

## ARTICLE 13: FAIR EMPLOYMENT PRACTICES

1. The Employer shall not discriminate against a worker or an applicant for employment because of race, creed, color, religion, national origin, citizenship, immigration status, sex or age, except as required by law.

2. The Employer shall not request information or documents from workers or applicants for employment as to their immigration status, except as required by law. No worker hired prior to November 6, 1986 shall be discharged due to his/her immigration status, nor shall any worker be asked to show authorization to work if the worker continues his/her employment after a temporary absence as defined in the immigration law and regulations.

3. The Employer shall not disclose confidential information concerning workers to the Immigration and Naturalization Service or its agents, except as required by law. Confidential information includes names, addresses, and social security numbers.

7

4. Employers shall comply with requests of workers to change names and social security numbers in the Employer's records, without prejudice to their seniority or other rights under this Agreement.

5. Should an INS agent demand entry to the Employer's premises or an opportunity to interrogate, search or seize the person or property of any employee, then the Employer shall immediately notify the Union by telephone call to the Union's office. The foregoing shall not require the Employer to deny the INS or the Department of Labor access to I-9 Forms, as required by law.

6. Nothing in this Article 13 shall require the Employer to violate the law.

### ARTICLE 14:  ASSIGNMENT TO OTHER WORK

1. A worker who is requested to perform work other than his/her regular work while his/her regular work is available shall receive for such other work his/her average hourly earnings during his/her last four (4) weeks of full employment on his/her regular work or his/her earnings in the new work, whichever is greater.

2. A worker who is requested to perform work other than his/her regular work while his/her regular work is unavailable shall receive for such other work the established piece or time rate therefore or a mutually agreed on guaranteed rate, but in no event less than the applicable craft minimum wage for such work provided in this Agreement.

### ARTICLE 15:  HOLIDAYS

See Schedule "A" or "B".

## ARTICLE 16:  RIGHT TO LEAVE SHOP — CALL-IN PAY

Workers shall not be required unreasonably to remain in the shop during the day when there is no work for them.  All workers who are requested or permitted to report for work shall be supplied with at least one-half (1/2) day's continuous work or be paid therefor at their average hourly earnings on their regular work.

## ARTICLE 17:  MILITARY SERVICE

Any regular employee serving in the armed service of the United States who applies for re-employment within ninety (90) days of his/her release or discharge from such service, shall be restored to his/her former or an equivalent position with all privileges and benefits formerly enjoyed, as far as possible, with the approval of the Union and in accordance with law.

## ARTICLE 18: BENEFIT FUNDS

1.  (a)  The Employer shall pay monthly to the Union for and on behalf of the Health and Welfare Fund of the Union, the ILGWU National Retirement Fund and the Eastern States Health and Welfare Fund a sum equivalent to the following percentage of its total gross weekly payroll on and after the following dates:

| | H & W | FICA | HSP | Retirement | Total |
|---|---|---|---|---|---|
| Effective June 15, 2000 | 16 | .46 | 4.375 | 4.5 | 25.335 |
| Effective June 15, 2002 | 16.5 | .46 | 4.375 | 4.5 | 25.835 |

The aforementioned funds are hereafter collectively referred to as "Benefit Funds".

9

If, at any time during the period of this contract, the Employer sends work to or contracts with an employer under contract with Locals 23-25 or 105 of the UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES, AFL-CIO, CLC, then the Employer shall pay two (2%) percent more than the preceding figures on account for all work sent to or contracted to the Local 23-25 or 105 shop.

The above includes a sum equivalent to .46% of the Employer's total payroll of employees in the bargaining unit, to enable the aforesaid Health and Welfare Fund to make payment of the Employer's share of Federal Social Security Taxes (FICA), on certain benefits paid by the Health and Welfare Fund to eligible workers. If there is an increase in the Employer's share of Federal Social Security Taxes (FICA), the Employer will pay such additional sum to the Fund to enable it to make full payment of the Employee's share of Federal Social Security Taxes (FICA).

(b) (i) Said total payroll shall be the gross wages (including direct holiday pay, vacation pay, bonuses, etc.) before deductions for taxes of all the workers and whether regular or trial period workers.

(ii) With respect to work done in contractors' shops on garments of an Employer, the Employer shall also pay at the same time and place and for the same period 19.000% of the total amount paid or due a contractor on garments manufactured by it for the Employer, directly or indirectly, and whether or not such contractor is under contract with the Union or with the International or an affiliate thereof or with another union or operates a non-Union shop. Effective June 15, 2002 said 19.000% shall become 19.376%. Said total amount shall not include payroll taxes; but it shall include, without exception, all other amount paid or due the contractor.

If at any time during the period of this contract, the Employer sends work to or contracts with

an employer under contract with Locals 23-25 or 105 of the UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES, AFL-CIO, CLC then the Employer shall pay two (2%) percent more than the preceding figures.

(c)   If at any time during the life of this Agreement, as a result of government mandated requirements, a benefit or a cost of any of the benefits shall be increased, or a new benefit required, or the cost to any fund of providing existing benefits is increased, the Union shall have the right to request additional Employer contributions to cover the expense thereof.

(d)   No workers shall be required under any circumstances to make any contributions whatsoever to the benefit funds.

(e)   In the event benefit fund contributions are collected on behalf of a health and welfare fund other than the Health and Welfare Fund of the Union, the Union shall remit such contributions to said other health and welfare fund.

2.   The Employer shall make its payments to the Union and file reports therewith on forms prescribed by the Union no later than the 20th day of each month for all moneys due the benefit funds for the calendar month immediately preceding.

The Employer shall pay nine ( 9%) percent interest on all contributions that are unpaid after 30 days following the date on which the contributions are due. In addition, should an Employer fail to make such reports or payments by the 20th of each month, the Employer shall be deemed in non-compliance with this Agreement. The Union or the Board of Trustees of a Fund or either of them shall be the proper parties in interest to enforce payments by the Employer of the amounts set forth above, and to require the filing of reports in connection therewith. They, or either of them, may proceed forthwith against any such Employer directly before the Impartial Chairman for an Award directing it to pay the amount due and directing it to file required reports.

Should the Impartial Chairman find against the Employer, he/she may order and direct the Employer to pay interest at a rate equal to the current annual prime rate of interest as set by the Amalgamated Bank of New York, 1710 Broadway, New York, New York, on each monthly payment from the date it became due. He/she may also order and direct the Employer to pay the cost of investigation together with reasonable attorney's fees and other expenses incurred in connection with the matter, and such other relief as he/she deems appropriate under the circumstances. They or either of them may, in addition, also institute appropriate action before a court or government agency or pursue any other remedies provided by law. The Union shall also have the right to strike the Employer to enforce payment due the benefit funds notwithstanding anything to the contrary in this Agreement.

3.     The said Health and Welfare Fund, the Retirement Fund and the Eastern States Health and Welfare Fund are irrevocable trusts and each shall be administered by a Board of Trustees, as required by law. If the Board of Trustees is deadlocked on any matter arising in connection with the Fund it administers, the matter shall be decided by a neutral person as set forth in the by-laws or rules and regulations of the said Fund, and his/her decision shall be final and binding.

4.     The parties hereby ratify, confirm and approve the composition and membership of each Board of Trustees of each benefit fund as now or hereafter constituted.

5.     The monies allocated and paid over to the Retirement Fund shall not be used for any purpose other than to provide benefits to workers on their retirement or to their beneficiaries on the death of such workers and to pay the operating and administrative expense of the Fund.

6.     The Board of Trustees of each benefit fund has adopted and promulgated by-laws or rules and regulations to effectuate the purpose of the benefit fund it administers including the specific benefits payable and the detailed basis upon which eligibility for benefits is determined and payments of benefits are made. Each benefit fund shall be maintained in accordance with its by-

laws, rules and regulations. The parties hereto consent to them and they are hereby incorporated in and made part of this Agreement. The parties agree that the Board of Trustees of each benefit fund may amend or modify its by-laws or rules and regulations from time to time, without notice, and the parties further agree that any such amendment or modification shall be deemed incorporated in and made part of this Agreement.

7.    (a)    The Board of Trustees or other body administering any of the benefit funds, except the ILGWU National Retirement Fund, is hereby authorized and empowered, in its sole discretion and upon such basis as it deems desirable, to transfer or mingle the assets of or to merge said Fund with any other fund or funds now existing or hereafter established and provided for in a collective agreement with the Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC, or an affiliate thereof. In the event of such mingling, transfer, or merger, the amounts herein above provided to be allocated towards the respective funds shall thereafter be paid over to the fund or funds with which there has been such mingling, transfer or merger.

(b)    The Board of Trustees of the ILGWU National Retirement Fund is hereby authorized and empowered in its sole discretion and upon such basis as it deems desirable to transfer or mingle the assets of said Fund or to merge said Fund with any other retirement fund or funds.

8.    Only the assets of each benefit fund shall be available for the payment of the benefits provided by that benefit fund and only to the extent that such benefit fund is financially able to make such payments.

9.    Except as provided elsewhere in this Agreement, the monies of each benefit fund shall be kept separate and apart from all other monies.

10.    None of the corpus or income of any benefit fund shall revert to any employer or association of employers, or to the International or any of its affiliates.

11.    An annual audit of each benefit fund shall be made by accountants designated by its Board of Trustees. A report of each audit shall be made available for inspection by interested persons at the principal office of each benefit fund and at such other places as may be designated by its Board of Trustees.

12.    No Employer shall have any legal or equitable right, title or interest in or to any sum paid by or due from the Employer or paid by or due from any other Employer to any of said benefit funds or in or to any of said funds. Nor shall any individual worker nor any beneficiary have any legal or equitable, vested or contingent, right, title or interest in, or claim against (I) his/her or any other employer's payments paid or due to said funds, or (ii) against said funds or the trustees thereof or their agents except as may be provided by law or by the by-laws or rules and regulations of said funds at the time of his/her application for benefits, or (iii) against his/her employer or the Association by virtue of anything provided in this Article.

13.    The Employer, however, shall have no obligations under this Article 18 or any additions or amendments thereto whenever, and to the extent that, the Employer performs work for a manufacturer or jobber who is required by its collective agreement to make payments to the aforesaid Funds or to comparable ILGWU Funds for the work performed for such manufacturer or jobber by the Employer; nor shall the contractor have any rights or claims to any such monies paid in by the manufacturer or jobber in whole or in part.

## ARTICLE 19: INDIVIDUAL CONTRACTS - SUB-CONTRACTING

1.    The Employer shall not enter into any individual contracts with any of its workers without prior Union approval.

2.    No Contractor shall sub-contract its work to any other shop unless it complies with the requirement of Article 22.

14

## ARTICLE 20: GARMENT ACCESSORIES

Belts, covered buttons, buckles, bias binding, tubular piping, shoulder pads, embroideries, hemstitching, pleating and tucking on garments as well as other garment accessories, which are caused by the Employer to be manufactured for it shall be made only by workers covered by a contract with a unit of the Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC.

## ARTICLE 21: JOB RIGHTS — ILLNESS — LEAVE OF ABSENCE

1.    (a)    An employee who has been absent because of his/her own bona fide illness, subject to verification, and returns to work within one (1) year after such absence begins, shall be entitled to (I) his/her regular job prior to such absence, if available, (ii) if it is not available, to another job. In any case, he/she shall be entitled to his/her regular job if it becomes available during the succeeding four (4) months.

(b)    If such employee returns after one (1) year of absence but not later than one and one-half (1 1/2) years of such absence, then such employee shall be entitled to any available job.

2.    A female employee shall be granted a maternity leave of absence up to twelve (12) months. The division of such leave before and after birth shall be at the sole option of the employee. After termination of her pregnancy, an employee shall be granted an extension of her leave not to exceed three (3) months. All requests for such leaves shall be supported by a doctor's certificate supplied by the employee.

In addition to any other leave of absence, but as an alternative to the leave contemplated in Paragraph 2, the Employer shall grant, upon request of the Union, up to six (6) months leave of absence without pay to male and female workers for the birth or adoption of a child (hereafter "parenting leave").

15

(a)    The Employer may hire a provisional worker for a period not to exceed six (6) months to take the place of any employee who is on parenting leave. Upon date of hire, the Employer shall give the Union and the provisional worker notice of the worker's provisional status. During such period, provisional workers shall be entitled to all the rights of regular workers under this Agreement. The Employer may retain a provisional worker as long as such action does not displace the worker on parenting leave or any other regular worker.

(b)    A worker on parenting leave shall be entitled to return to work on his or her regular job prior to such absence or an equivalent position, and shall not lose any rights and privileges under this Agreement.

3.    **FAMILY LEAVE**: In addition to any other leave of absence, the Employer shall grant, upon written request of the Union, up to six (6) months leave of absence without pay to male and female workers to care for a spouse, parent/s or children (hereafter "family leave"). A written request for family leave shall specify the beginning and end dates of the leave and the Employer will not be obligated to permit an employee on family leave to return to work prior to said end date.

(a)    The Employer may hire a substitute worker for a period not to exceed the duration of the family leave to take the place of any employee who is on family leave. Upon date of hire, the Employer shall give the Union and the substitute worker notice of the worker's substitute status. The return of the employee on family leave shall be good cause for the discharge of the substitute employee.

(b)    A worker on family leave shall be entitled to return to work on his or her regular job prior to such absence or an equivalent position on the end date of said leave, and shall not lose any rights and privileges under this Agreement.

4.    The Employer shall grant a leave of absence for the period required to perform military service, jury duty or union business. Employees on military leave shall be given all pay and benefits required by applicable law. Employees serving on jury duty shall be paid as provided by Mass. Gen. Laws, c. 234A, s. 48.

5.    An employee may obtain a leave of absence for any other reason up to one hundred and eighty (180) days upon written application to the Employer.

6.    (a)    Any leave of absence may be extended up to an additional one hundred and eighty (180) days for good cause shown.

(b)    The Employer shall not unreasonably withhold its consent to the original application or the extensions.

7.    An employee who returns to work under the terms of a leave of absence granted under Paragraphs 2, 3, 4, or 5 above shall be entitled to the job rights set forth in Paragraph 1(a) above.

## ARTICLE 22: CONTRACTORS — ADDITIONAL SHOPS MOVING — INTEGRATED PRODUCTION

1.    The Employer shall have no work performed outside its own shop unless the workers of its inside shop are fully supplied with work, and unless such outside shop is under contract with a unit of the Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC, and has complied with the terms thereof, and maintains at least the standard of wages and hours established under this Agreement. With respect to any work done by such outside shop on garments for the Employer, the Employer herein shall also be responsible to the employees of

such outside shop for their unpaid wages and the appropriate unit of the Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC, for dues and other monies due it.

2.    Should the Employer desire to expand or open an additional shop, notice thereof shall be given by said Employer to the Union prior to the expansion or opening of such shop and such shop shall be operated under all the terms and conditions of this Agreement. In no case, however, shall the operation of such shop result during the term of this Agreement and for a period of three (3) years thereafter in reducing the work or the earning opportunities or the number of workers at present employed in the shop to which this Agreement is now applicable.

3.    The Employer shall not move its shop during the term of this Agreement from its present location to any place beyond which the public carrier fare is more than sixty (60) cents. Under extraordinary circumstances, when it is impossible to obtain new factory quarters within this zone, the Union may be requested to give its consent to another location and may, at its option, consent thereto.

4.    In order to safeguard working standards and employment opportunities of the workers covered by this and other agreements in the garment industry, it is agreed that all garments or parts thereof and accessories handled by the Employer during the term of this Agreement, whether finished or partly finished, shall be manufactured exclusively either in its own shop, or as parts of an integrated process of production under the jobber-contractor system of production, in a shop under contract with a unit of the Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC; and accordingly, the Employer shall not handle, purchase, import or otherwise obtain, directly or indirectly, any other wholly or partly finished garments whatsoever during the term of this Agreement.

## ARTICLE 23:  CROSSING PICKET LINE

To the extent permitted by law, it shall not be considered a breach of this Agreement on the part of the Union or on the part of any individual employee if any employee or employees refuse to cross any picket line recognized by the Union or to enter upon the picketed premises of the Employer, either of their own volition or by direction of the Union, nor shall such refusal be cause for discharge or discipline.  Workers who observe such picket lines or refuse to enter upon the premises of the Employer shall be reinstated to their jobs immediately upon their request or the request of the Union to do so.

## ARTICLE 24:  LABOR DISPUTE — STRUCK WORK

The Employer shall not perform any work for or give any work to any jobber, manufacturer, contractor, or sub-contractor engaged in the apparel and clothing industry with which a labor dispute exists or against which a strike has been declared, and in no event shall it request any of its employees to perform work destined directly or indirectly for such concern.  Such work shall not be deemed in the workers' regular course of employment, and the workers need not perform such work.

## ARTICLE 25:  RECALL AFTER LAYOFF

Employees laid off shall be recalled to work before any new employees are hired.

## ARTICLE 26:  ACCESS TO SHOP — EXAMINATION OF BOOKS, PAYROLL RECORDS

1.      Representatives and employees of the Union, including engineers and accountants, shall have access to the shop of the Employer during working hours to take up complaints or to determine compliance with the terms of this Agreement.

2.     The Employer shall, upon request, submit to such representatives and employees of the Union the payroll books and records and all other pertinent books and records for examination for the purpose of determining compliance with the terms of this Agreement, and the data including time study records employed in setting wages and piece rates.

3.     The failure of the Employer to permit access to the shop or to submit such books, records or data shall be presumptive evidence of the violation complained of and shall justify sustaining the Union's complaint. Moreover, in the event of such failure by the Employer, the Union at its option may consider that the Employer has forfeited its rights under the Agreement.

4.     The Employer shall send to the Union office monthly a copy of its payroll for the last work week of the preceding month, which shall include for each employee his/her name, date of employment, craft, operation and section, straight time hours and wages, and overtime hours and wages.

## ARTICLE 27:  AGENCY

The Employer agrees that the sole persons authorized or having the power to act as agents of the Union, or to bind the Union legally with respect to matters arising out of this Agreement or arising out of the relations between the Employer and the Union, or to subject the Union to any liability whatever by reason of any act or omission are the Manager of the Union and the designated Business Agent servicing the shop (or such substitute or additional persons as the Union may hereafter formally designate by written notice). The Union shall not be responsible for the acts or omissions of any other person, including members and employees of the Union. The Employer further agrees that the Union, in entering into or administering this Agreement, is not an agent of or acting on behalf of the Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC, and that in no event shall the latter be bound by or liable under this Agreement or be otherwise liable.

## ARTICLE 28: NON-PAYMENTS — RESPONSIBILITY

1.    Notwithstanding any other provision of this Agreement, if the Employer fails for five (5) days to pay in full any wages due to its workers covered by this Agreement, any dues or other monies due to the Union, any payments due under Article 7, or any payments due towards the Funds as provided in Article 18, the Union may immediately direct the workers to discontinue work until all sums due have been paid in full and/or may immediately institute action in a court of law or equity or before an administrative tribunal to obtain payment of such sums.  These rights shall be in addition to all other remedies available to the Union.

2.    In the event of any breach of this Agreement by the Employer (including any non-payment by the Employer of sums due to any employees for wages, holiday pay, or otherwise) the Union in its own name shall be a proper party in interest to enforce compliance with this Agreement on the Union's own behalf and on behalf of any affected employees without further assignments or authorization from them.

## ARTICLE 29:  CHANGE AND COST OF LIVING

A cost of living adjustment (herein referred to as COLA, shall be calculated and become effective as of January 1, 2002, as follows:

Should the net cost of living increase as reflected in the U.S. Consumer Price Indices described below, exceed 7% for the month of November, 2001 over the month of June, 2000, then a COLA shall be given on January 1, 2002 on the following basis:

| When Net Cost of Living Increase is | Piece Workers Increase Add-On Is | Time Workers |
|---|---|---|
| 8.5% | 2.0% | $.10 |
| 9.0% | 3.0% | $.15 |
| 9.5% | 4.0% | $.20 |
| 10.0% | 4.5% | $.25 |

21

Rises in the Consumer Price Index shall be measured over an eighteen (18) month period, as set forth above, by utilizing the Consumer Price Indices for Urban Wage Earners and Clerical Workers, U.S. Cities Average, printed and released in the months of July, 2000 through December, 2001.

The cost of living adjustment set out in this Article shall be added to the hourly rate applicable to time workers as of December 31, 2001 and to the pre-contract add-on of piece workers. Once added, the cost of living will be a part of the hourly rate or add-on.

If the wage increase brings a time worker's hourly rate above the contract minimum, the time workers shall receive the higher rate.

## ARTICLE 30: CHANGE IN LEGAL MINIMUMS

Whenever the legal minimum wage is increased under federal or state law, minimum wages under this Agreement shall be at least twenty (20) cents above such legal minimum wage, and corresponding increases shall be made in the piece rate and wage structure of the shop. In the event of any disagreement on such increases, the matter shall be treated as a dispute under Article 33.

## ARTICLE 31: LIMITATION ON VACATIONS

The Employer shall not designate or provide a vacation period or shut down its shop (or a part thereof) for the purpose of providing a vacation unless the particular action is effected pursuant to a written agreement signed by the Employer and the Union (through its representatives as defined in this Agreement) particularly specifying a vacation as the purpose thereof. Any action contrary to the foregoing, whether taken by the Employer unilaterally or with the consent of any individual employee or group of employees, shall be wholly ineffective and shall not be deemed to constitute or provide a vacation.

## ARTICLE 32: NO-STRIKE, NO-LOCKOUT PLEDGES

Unless permitted to do so by some other provision of this Agreement, the Union agrees that it will not call, authorize or ratify a strike or stoppage during the life of this Agreement, except for the Employer's failure to submit to arbitration or to comply with the decision of an arbitrator or with a settlement of a dispute reached by representatives of the Employer and the Union. Should any strike or stoppage occur, the Union's sole obligation shall be to endeavor in good faith, within twenty-four (24) hours after receipt of written notice thereof from the Employer, to bring about the return to their work of its members who have stopped work. Upon the failure of any employees to return to work within said twenty-four (24) hours period, the Employer may at its option consider that such employees have abandoned their employment; but should the Employer re-employ such employees, it shall treat all such employees alike and shall not discriminate against or among them. Compliance by the Union in good faith with this provision shall be deemed full compliance with the Union's obligation hereunder.

The foregoing no-strike, no-stoppage obligations shall be wholly suspended and of no force and effect, and the Union may call, authorize or ratify a strike or stoppage, during the continuance of any strike or stoppage (not in violation of contract) declared by the Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC, or any unit thereof at any plant of any firm which is directly or indirectly affiliated with or related to the Employer herein.

The Employer shall not order, authorize or ratify a lockout during the life of this Agreement. Should any lockout occur, the Employer's sole obligation shall be to endeavor in good faith, within twenty-four (24) hours after receipt by the Employer of written notice thereof from the Union, to terminate the lockout and to re-employ the employees. Upon failure of the Employer to do so within a twenty-four (24) hour period, the Union at its option may treat the matter as

23

a dispute under Article 33 or may consider that the Employer has forfeited its rights under the Agreement.

### ARTICLE 33:  ADJUSTMENT MACHINERY
### COURT ACTIONS BARRED

1.    Any and all disputes, complaints, controversies, claims or grievances whatsoever between the Union or any employees and the Employer, or any person responsible under Article 27, which directly or indirectly arise under, out of, or in connection with or in any manner relate to this Agreement or the breach thereof, or the acts, conduct or relations between the parties shall be adjusted as follows:

(a)    The Shop Chairman or in the case of piece rate disputes, the Price Committee, together with a representative of the Union shall attempt to settle the matter with a representative of the Employer.  No adjustment shall be deemed binding on the Union unless approved by an authorized representative under Article 27,

(b)    If they shall fail satisfactorily to dispose of any such dispute, complaint, controversy, claim or grievance, or if for any reason it has not been taken up by them, or if the matter does not lend itself to the foregoing procedure the matter shall be submitted to arbitration, the arbitrator herein named being _____.  Should the Impartial Chairman resign, refuse to act, or be incapable of acting or should the office become vacant for any reason or should either party request that the Impartial Chairman not hear a particular case, then and in that event the parties hereby designate _____ to act as the Impartial Chairman.  If _____ resigns, refuse to act or is incapable of acting or should either party request that he/she not hear a particular case then and in that event an Ad Hoc Impartial Chairman for that unresolved dispute will be selected by the American Arbitration Association pursuant to its then applicable Voluntary Labor Arbitration Rules.  The successor or Ad Hoc Impartial Chairman shall have all the rights and

powers of the Impartial Chairman named herein. The award or decision of the arbitrator, in addition to granting such other relief as the arbitrator may deem proper, may contain provisions commanding or restraining acts and conduct of the parties. If either party shall default in appearing before the arbitrator, he/she is empowered nevertheless to take the proof of the party appearing and render an award thereon. Any award or decision of the arbitrator shall be final and shall be enforceable by appropriate proceedings at law or in equity. The taking of the oath by the arbitrator is hereby expressly waived. His/her fee shall be borne equally by the parties hereto.

(c)    The parties agree that any papers, notices or processes to initiate or continue an arbitration hereunder may be served by mail, and all papers, notices or processes in any application to a court to confirm or enforce an arbitration award hereunder, including service of the papers conferring jurisdiction of the parties upon the court, may be served by registered mail, directed to the last known address of the Employer, or the Union.

2.    It is intended and agreed that the procedure herein established for the adjustment of disputes shall be the exclusive means for the determination of all disputes, complaints, controversies, claims or grievances whatsoever, including the arbitrability of any dispute, and including claims based upon any breach of the no-strike, no-stoppage pledges of this Agreement or upon any other breach of this Agreement. It is intended that this provision shall be interpreted as broadly and inclusively as possible. Unless authorized to do so by some other Article of this Agreement, neither party shall institute any action or proceeding in a court of law or equity, state or federal, or before an administrative tribunal, other than to compel arbitration, as provided in this Agreement, or with respect to the award of an arbitrator. This provision shall be a complete defense to and also ground for a stay of any action or proceeding instituted contrary to this Agreement.

3.    Any dispute, complaint, controversy, claim or grievance hereunder which any employees may have against the Employer may be instituted and processed only by the Union in the manner herein provided. No employee shall have the right individually to institute or process any action or proceeding with reference to any dispute, complaint, controversy, claim or grievance; or to initiate or compel arbitration in the event the Union fails or refuses to proceed with arbitration.

### ARTICLE 34:  NEW PRODUCTS

If the Employer at any time makes garments in any branch of the garment industry other than or in addition to the branch in which the Employer is presently engaged, the Union at its option may forthwith renegotiate the terms of this Agreement with respect to such Employer. In the event of any disagreement concerning the new terms, the matter shall be treated as a dispute under Article 33.

### ARTICLE 35:  SUBSIDIARY, AUXILIARY OR AFFILIATED FIRMS

1.    Subsidiary, auxiliary or affiliated firms or corporations within 1000 miles of the City of Boston shall, for the purpose of this Agreement, be deemed bound by all the terms of this Agreement. The Arbitrator selected as provided in Article 33 shall have the right and power to determine whether an alleged subsidiary, auxiliary or affiliate of the Employer is such subsidiary, auxiliary or affiliate, and shall be guided by the proof of facts tending to establish any connection or interest, direct or indirect, between them or tending to establish a plan, scheme, or device on the part of the Employer to avoid or evade the provisions of this Agreement by or through such subsidiary, auxiliary or affiliate.

2.    The Employer shall not enter into any partnership or consolidate or merge with another person, firm or corporation in the industry, unless the new firm assumes this Agreement for the full term thereof, including all obligations theretofore accrued. This paragraph is not limited to within 1000 miles of the City of Boston.

### ARTICLE 36:  UNION LABEL

If the manufacturer or jobber or other entity is/are under contract with the Union then the Employer shall affix a **UNITE** Union Label to all garments and accessories manufactured in its shops and in the shops of its contractors, if any, in accordance with the rules, regulation, and procedures promulgated by the Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC.

### ARTICLE 37:  LIQUIDATED DAMAGES FOR VIOLATIONS

Should the Employer violate any other provision of this Agreement where it is difficult or impossible to ascertain the specific amount of damages suffered by its workers or the Union, then the Employer shall be liable to the Union for liquidated damages.  In fixing these damages, there shall be taken into account any advantages gained by the Employer through its violation, any deprivation of earnings suffered by workers, and such other factors as are fair under the circumstances.  If the Union and the Employer are unable to agree upon the amount of liquidated damages for such violation, then the matter shall be treated as a dispute under Article 33.  The proceeds of any such liquidated damages shall be paid to the Union.

### ARTICLE 38:  EMPLOYER LIABILITY AND RESPONSIBILITY

The Employer shall be and continue to remain liable under this Agreement while it remains in force and effect, irrespective of whether such Employer shall become a member of a multi-employer Collective Bargaining Association during the continuance of this Agreement.

### ARTICLE 39:  ADDITIONAL PROVISIONS

The provisions contained in Schedules "A" or "B" hereto annexed shall constitute part of this Agreement.

## ARTICLE 40:  BEREAVEMENT PAY

In the event of death in the family of any employee, the employee shall be granted four (4) days' leave with pay based on seven hours pay for each day at the employee's minimum rate.  For the purposes of this Article, a member of the family shall be the employee's wife, husband, child, father, mother, sister and brother and grandchildren.  Bereavement leave for the death of a mother-in-law or father-in-law shall be granted pursuant to the understanding of the parties.

## ARTICLE 41:  CONFORMITY TO LAW — SAVINGS CLAUSE

1.      If any provision or the enforcement or performance of any provision of this Agreement is or shall at any time be contrary to law, then such provision shall not be applicable, enforced or performed, except to the extent permitted by law.  If at any time thereafter such provision or its enforcement or performance shall no longer conflict with the law, then it shall be deemed restored in full force and effect as if it had never been in conflict with the law.

2.      If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of the Agreement, or the application of such provision to other persons or circumstances, shall not be affected thereby.

## ARTICLE 42:  HOLIDAY TRUST FUND CLAUSE

1.      In order to provide for the payment of holiday pay for workers covered by this contract various employers have established a Holiday Fund and each Employer agrees to make payments as provided for below in Paragraph 3 to the Holiday Fund to be administered by the firm of Wolf & Schulman, Accountants, and to be bound by the Holiday Trust Agreement whose Trustees and Administrators are empowered to receive and enforce the payments to such Fund and to pay out of the Fund Holiday pay to eligible workers as intended by the terms of this Agreement.  It is

agreed that the Employer has no interest in the Fund or its assets and shall not receive any refunds from said Fund except where the contributions exceed the costs of the holiday payments and the costs of administration and reserve.

2.    It is agreed that failure by an Employer to pay into the said Fund the amount provided for herein shall be deemed a violation of this Agreement and the Union shall also have the right to enforce such payment in the same manner as it may enforce payments to other funds provided for under the terms of this Agreement.

3.    The Employer agrees to pay to the aforesaid Holiday Fund at the rate of five and one-half (5 1/2%) percent of its bills for work performed for non-contributing manufacturers and jobbers, and these contributions are due within a week from the time of the billing to the non-contributing manufacturers and jobbers (i.e., those manufacturers and jobbers who do not make contributions to the Holiday Fund).

4.    The Employer agrees that the other jobbers or manufacturers (i.e., those manufacturers and jobbers who do make contributions to the Holiday Fund) for whom they work are authorized to deduct the sum of the applicable percentage from the face amount of the bills of the contractors for all work performed for the jobber or manufacturer for the payment of holidays through the Holiday Fund.  The contribution rate shall be five and one-half (5 1/2%) percent.

5.    In instances where the amounts paid by or on behalf of a contractor are insufficient to cover its obligations for disbursement of holiday pay to the covered workers, the contractor shall be billed for the insufficiencies by the Administrator and shall make such payments within five (5) days of the receipt of the bill.

## ARTICLE 43: COOPERATION

A committee shall be established during the period of this Agreement to undertake a study of the future of the garment industry in our area. This committee shall be comprised of representatives of the Employer and the Union. The aim of this committee shall be to determine trends in labor, real estate, automation, production, etc. that may affect the future of the garment industry in our area. The cost shall be borne equally by the parties and reports issued yearly.

## ARTICLE 44: PIECE RATE REVIEW

The New England Joint Board will continue to review piece rate prices whenever the Employer installs machinery in its shop that changes the time and effort necessary to complete the required work on the given garment. If the Employer is not satisfied with the results of the New England Joint Board's review of the piece rate prices, the Employer will be free to file a grievance pursuant to the attached Collective Bargaining Agreement.

## ARTICLE 45: IMPORTS

A.    (i)    The parties agree that the import of wholly or partly finished garments, violates this Agreement and results in damaging the interest of the workers and the Union by depreciating the labor standards and employment opportunities secured in this collective agreement. Because the specific amount of such damage is difficult if not impossible to ascertain, it is agreed that upon such violation, the Employer shall pay to the Union liquidated damages equal to one and one-half (1 1/2%) percent of the first cost of a substantial amount of imported garments.

(ii)    For the purpose of this Agreement, (a) the first cost of imported garments means the price at which they are sold or offered for sale in the exporting country in the ordinary course of the export trade to the United States plus the cost of packaging for shipments to the United States

plus the price of delivery to the side of the overseas vessel, and (b) a substantial amount of imported garments means imported garments which exceed twelve and one-half (12 1/2%) percent of the dollar amount of an Employer's total annual volume of sales.

(iii)     Wholly or partly finished garments or parts thereof brought into the United States in any amount pursuant to Item 807 of the Tariff Code or its successor or any other similar authority shall also be deemed imported garments, but the measure of liquidated damages herein above provided for imported garments shall be eight and one-half (8 1/2%) percent of the first cost of a substantial amount of garments brought into the United States under Item 807 of the Tariff Code.

### ARTICLE 46: HEALTH, SAFETY AND SANITATION

The Employer shall comply with all standards of health, safety and sanitation, including local fire department regulations.  The Employer shall be exclusively responsible for health, safety and sanitation conditions in its shops.  Neither the Union nor its agents or representatives shall be liable for any job-related injury, illness or death

(a)     The Employer will provide drinking fountains.  Toilets and washrooms, work and rest areas, and lunchrooms will be kept in a clean, sanitary condition, and will be well lighted and heated.

(b)     The Union may designate a Safety Representative in each shop.  The Employer will grant reasonable time off for the Safety Representative to investigate health, safety and sanitation problems and provide full compensation for lost working time.

The Union shall designate representatives to a Joint Advisory Committee on Garment Industry Health, Safety and Sanitation, comprised of an equal number of Employer and Union

representatives. The Committee shall meet at least three (3) times per year. The Committee may in its discretion engage in, but is not limited to, the following activities:

1. periodic shop inspections,

2. recommendations for the correction of unsafe or harmful conditions and practices, and

3. review and analysis of reports of industrial injury or illness, investigation of same, and recommendations for rules and procedures to prevent accidents and disease and for the promotion of the health, safety and sanitation of the workers.

   A worker may refuse to perform work which he/she reasonably believes would pose a serious threat of injury or illness.

## ARTICLE 47: MISCELLANEOUS

The Union shall make available to the Employer annually a list of all medical, prescription, health benefits and programs available to employees.

## ARTICLE 48: TERM

This Agreement shall go into effect as of the 15th day of June, 2000 and shall continue in effect until the 15th day of June, 2003.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be signed as of the day and year first above written.

**A.T. SPORTSWEAR INC.**

**LOCALS 12, 33, 46, 73, 80, 229, 242, 281, 291, 397, 524 & 554 of the NEW ENGLAND JOINT BOARD, UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES, AFL-CIO, CLC**

**Employer-President**

**Union Representative**

**Date:** 6 - 7 - 0

33

## SCHEDULE "A"
## MADE PART OF THE FOREGOING AGREEMENT

### MINIMUM WAGES

All minimum wages listed below for all crafts are meant to be minimum wages only.  Increases may be granted over and above these minimums for skill and efficiency development.

| | Effective 6/15/00 | Effective 6/15/01 | Effective 6/15/02 |
|---|---|---|---|
| **OPERATORS** | | | |
| After 4 weeks | 6.55 | 6.90 | 7.05 |
| After 8 weeks | 6.60 | 6.95 | 7.10 |
| After 12 weeks | 6.65 | 7.00 | 7.15 |
| After 16 weeks | 6.70 | 7.05 | 7.20 |
| **FLOOR** | | | |
| After 4 weeks | 6.40 | 6.75 | 6.90 |
| After 8 weeks | 6.45 | 6.80 | 6.95 |
| After 12 weeks | 6.50 | 6.85 | 7.00 |
| After 16 weeks | 6.55 | 6.90 | 7.05 |
| **PRESSERS** | | | |
| After 4 weeks | 9.25 | 9.40 | 9.55 |
| After 8 weeks | 9.30 | 9.45 | 9.60 |
| After 12 weeks | 9.35 | 9.50 | 9.65 |
| After 16 weeks | 9.40 | 9.55 | 9.70 |
| **UNDERPRESSERS** | | | |
| After 4 weeks | 7.70 | 7.85 | 8.00 |
| After 8 weeks | 7.75 | 7.90 | 8.05 |
| After 12 weeks | 7.80 | 7.95 | 8.10 |
| After 16 weeks | 7.85 | 8.00 | 8.15 |
| **CUTTERS** | | | |
| After 4 weeks | 11.60 | 11.75 | 11.90 |
| After 8 weeks | 11.65 | 11.80 | 11.95 |
| After 12 weeks | 11.70 | 11.85 | 12.00 |
| After 16 weeks | 11.75 | 11.90 | 12.05 |
| **SPREADERS** | | | |
| After 4 weeks | 9.60 | 9.75 | 9.90 |
| After 8 weeks | 9.65 | 9.80 | 9.95 |
| After 12 weeks | 9.70 | 9.85 | 10.00 |
| After 16 weeks | 9.75 | 9.90 | 10.05 |

## WAGE INCREASES

All time workers shall receive the percentage increases specified below or the contract minimum whichever is higher.

> July 31, 2000 -    3%
>
> June 15, 2001 -    3%
>
> January 1, 2002 - COLA, if applicable
>
> June 15, 2002 -    3%

The Employer agrees to pay the Boston area negotiated general increase each year of this agreement.

All piece workers including pressers shall receive over and above their regular piece work earnings, the percentage increase as specified in relevant shop memoranda.

### RE: ARTICLE 15, HOLIDAYS

All employees shall observe the following holidays, whether time or piece workers, and shall be paid a full day's pay for them in any event and regardless of whether such holidays fall on a working day or non-working day of the week or in any non-working week:

> Memorial Day
> Independence Day (July 4)
> Labor Day
> Columbus Day
> Veterans Day
> Thanksgiving Day
> Day After Thanksgiving
> Christmas Day
> New Year's Day
> Washington's Birthday
> Good Friday
> Chinese New Year - Employee's Birthday

Effective, January 1, 2000, notwithstanding the above, Veterans Day holiday pay will be payable on Bunker Hill Day. Employees will work on Bunker Hill Day and receive regular pay for their work in addition to the Veterans Day holiday pay which will be paid on Bunker Hill Day.

35

➤ Chinese New Year - Employee's Birthday holiday will be celebrated as follows: Employees will have the option of working or not working on the holiday but holiday pay for the holiday will not be paid until the Chinese New Year. Pay for this holiday shall be issued to all employees on the Chinese New Year.

1.   An employee shall be eligible for holiday pay provided that, while work is available, he/she works both the day before and the day after the holiday, unless his/her absence is for justifiable cause or unless the employee fails to work during the ten (10) work days before **and** the ten (10) work days after the holiday.

2.   Holiday pay for each piece worker shall be based upon his/her average earnings during his/her last four (4) weeks of full employment on his/her regular work prior to the holiday but subject to the maximums for operators and pressers set out elsewhere in this Agreement. Holiday pay for each time worker shall be at his/her regular rate.

3.   In the event work is performed on any such holiday, it shall be paid for at the rate of time and one-half in addition to the holiday pay.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be signed as of the day and year first above written.

**A.T. SPORTSWEAR INC.**

**LOCALS 12, 33, 46, 73, 80, 229, 242, 281, 291, 397, 524 & 554 of the NEW ENGLAND JOINT BOARD, UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES, AFL-CIO, CLC**

_____
**Employer-President**

_____
**Union Representative**

36

## SCHEDULE "B"

## MADE PART OF THE FOREGOING AGREEMENT

## FOR SPORTSWEAR ONLY

Jackets shall be settled with the Presser's Price Committee based on the amount of work and effort required in pressing each style.

Maintenance of Cost Status Quo — The Employer may continue their present method of operation and pricing in every craft. It is the intention and purpose of this Article that the wages and/or unit labor costs to each member shall not be increased or decreased by virtue of any Article or Paragraph of this Agreement except as may herein be otherwise provided.

## WAGE INCREASES AND MINIMUMS FOR SPORTSWEAR AND DRESSES

July 31, 2000   -   3%

June   15, 2001 -   3%

January 1, 2002 - COLA, if applicable

June   15, 2002 -   3%

The employer agrees to pay the Boston area negotiated general increase each year of this agreement.

**Minimums** — the following minimum wages shall be applicable for the following crafts at the times specified below:

| | Effective 6-15-00 | Effective 6-15-01 | Effective 6-15-02 |
|---|---|---|---|
| **Cutters** | 11.75 | 11.90 | 12.05 |
| **Pleaters** | 8.65 | 8.80 | 8.95 |
| **Spreaders** | 9.75 | 9.90 | 10.05 |

**YIELDS:** Operators yield is 30% above the craft minimum. All minimum wages listed above for all crafts are meant to be minimum wages only. Increases may be granted over and above these minimums for skill and efficiency development.

### HOLIDAYS - DRESSES/SPORTSWEAR

The Employer shall observe Good Friday, Memorial Day, Independence Day (July 4), Labor Day, Thanksgiving Day, the Day after Thanksgiving, Christmas Day, and New Year's Day,

**In addition to the above:** Effective June, 2001 Columbus Day will be a paid holiday. Effective June, 2002 Washington's Birthday will be a paid holiday. Effective January, 2003 Bunker Hill Day will be a paid holiday.

Time workers shall be paid for these holidays at their respective hourly rates for seven hours. Operators shall be paid their average with a $59.00 Maximum. Effective June 15, 2001, the operators maximum will increase to $60.00 per holiday; Effective June 15, 2002, the operators maximum will increase to $61.00 per holiday. Pressers shall be paid their average with a $66.00 maximum. Effective June 15, 2001, the pressers maximum will increase to $67.00 per holiday. Effective June 15, 2002, the pressers maximum will increase to $68.00 per holiday.

Holiday pay shall be paid for each of the aforesaid holidays regardless of whether such holidays fall on a working or non-working day of the week and regardless of whether the shop is working during the week in which the holiday occurs. Any work performed on any of the aforesaid holidays shall be paid at the rate of time and one-half plus holiday pay. No worker shall be required to work on the aforesaid holiday, and refraining from work on these days shall not be considered a stoppage or breach of any of the provisions of this Agreement. The Union will lend its best efforts in having employees work the full scheduled work days immediately preceding and following the above paid holidays. An employee shall be eligible for holiday pay, provided, that while work is available he/she works both the day before and the day after the holiday unless

- his/her absence is for justifiable cause or unless the employee fails to work during the ten (10) work days before **and** the ten (10) work days after the holiday.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be signed as of the day and year first above written.

**A.T. SPORTSWEAR INC.**

**LOCALS 12, 33, 46, 73, 80, 229, 242, 281, 291, 397, 524 & 554 of the NEW ENGLAND JOINT BOARD, UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES, AFL-CIO, CLC**

_____
**Employer-President**

_____
**Union Representative**

Date: ___6 - 7 - 00___

39

## LETTER OF UNDERSTANDING

It is acknowledged that the parties have not yet agreed to the identity of the Impartial Chair or Alternate Impartial Chair called for in Article 33. Until such agreement is reached the parties agree that they will promptly attempt to agree on the identity of an Acting Impartial Chair to hear and decide each case. In the event that no agreement is reached within five (5) days of the moving party's request for agreement then and in that event an Ad Hoc Impartial Chair for that unresolved dispute will be selected by the American Arbitration Association pursuant to its then applicable Voluntary Labor Arbitration Rules.

**For the Employer**
**A.T. SPORTSWEAR INC.**

**For the Union**

Date: 6 - 7.00

NEW ENGLAND JOINT BOARD
VALIDATED
MANAGER
6-24-0
DATE
UNITE·A.F.L.·C.I.O.

40

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

WARREN PEPICELLI, as he is TRUSTEE of the UNITE NATIONAL HEALTH FUND; and as he is TRUSTEE of the TRUSTEE of the UNITE NATIONAL RETIREMENT FUND

## DEFENDANTS

A.T. Sportswear, Inc.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Gregory A. Geiman
Segal, Roitman & Coleman
11 Beacon Street, Suite #500
Boston, MA 02108

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION      (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                              AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN      (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

Transferred from
☐ 5 another district (specify)

☐ 6 Multidistrict Litigation

Appeal to District Judge from
☐ 7 Magistrate Judgment

## V. NATURE OF SUIT      (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☒ 791 Empl. Ret. Inc Security Act | ☐ 871 IRS – Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION      (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

This is a claim to collect unpaid benefit fund contributions, brought pursuant to ERISA, 29 U.S.C. Sec. 1132.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY      (See instructions)

N/A

JUDGE _____      DOCKET NUMBER _____

DATE
12/15/04

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

FOR OFFICE USE ONLY

RECEIPT # _____      AMOUNT _____      APPLYING IFP _____      JUDGE _____      MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. **TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)** Warren Pepicelli, as he is Trustee of the UNITE National Health Fund, et al v. A.T. Sportswear, Inc.

2. **CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).**

   ___ I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   _X_ II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

   ___ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

   ___ IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 690, 810, 861-865, 870, 871, 875, 900.

   ___ V.   150, 152, 153.

3. **TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E)).**
   N/A

4. **HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?**   YES ☐   NO ☒

5. **DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST? (SEE 28 USC 2403)**   YES ☐   NO ☒
   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?   YES ☐   NO ☐

6. **IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC 2284?**   YES ☐   NO ☒

7. **DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER COUNTY) - (SEE LOCAL RULE 40.1(C)).**   YES ☐   NO ☒
   **OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? - (SEE LOCAL RULE 40.1(D)).**   YES ☐   NO ☒

8. **DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF THE DISTRICT?**   YES ☐   NO ☒
   (a)   IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE?_____

9. **IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE?** N/A

10. **IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE CENTRAL SECTION: YES ☐ NO ☐ N/A OR WESTERN SECTION: YES ☐ NO ☐**

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Gregory A. Geiman

ADDRESS Segal, Roitman & Coleman, 11 Beacon Street, Suite #500, Boston, MA 02108

TELEPHONE NO. (617) 742-0208

(Categfrm.rev - 3/97)